UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
DEBORAH HOOPER,

            Plaintiff,

       -against-

CAROLYN W. COLVIN, Acting
Commissioner, Social Security
Administration,

           Defendant.
----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/5/16
```

**OPINION AND ORDER**

15-CV-6646 (JLC)

**JAMES L. COTT, United States Magistrate Judge**.

    Plaintiff Deborah Hooper (also known as Deborah Tripp) brings this action

seeking judicial review of a final determination by defendant Carolyn Colvin, Acting

Commissioner of Social Security ("Commissioner"), denying Hooper's application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

At the Court's direction, the parties filed a joint stipulation that set out their

respective positions in lieu of cross-motions for judgment on the pleadings. For the

reasons set forth below, the case is remanded to the Commissioner for further

proceedings.

## I.   BACKGROUND

### A.   Procedural History

Hooper applied for DIB on March 1, 2012 and for SSI on April 5, 2012.

Administrative Record ("AR") (Dkt. No. 12), at 14.[1]  She claimed that her disability

began on January 1, 2008, but her counsel later amended the onset date to January

1, 2009.  *Id.* at 469.  The SSA denied both applications on May 4, 2012.  *Id.* at 109-

11.  Hooper requested a hearing before an Administrative Law Judge ("ALJ") and

appeared before ALJ Roberto Lebron on July 1, 2013; August 20, 2013; and

November 26, 2013.  *Id.* at 30, 64, 84, 117, 125.  The ALJ found that Hooper was not

disabled and denied her claims in a written decision dated March 20, 2014.  *Id.* at

11, 24.  Hooper requested review of the ALJ's decision on May 6, 2014, and the

Appeals Council denied review on June 23, 2015, rendering the ALJ's decision the

final agency determination.  *Id.* at 1, 7.

Hooper timely commenced this action on August 21, 2015, seeking judicial

review of the denial of benefits pursuant to 42 U.S.C. § 405(g).  *See* Complaint, Aug.

21, 2016, Dkt. No. 1.  The Court ordered that, in lieu of cross-motions for judgment

on the pleadings, the parties should instead file a Joint Stipulation that set out the

parties' respective positions.  *See* Order dated Sept. 11, 2015, Dkt. No. 8.[2]

---

[1] The Social Security Administration ("SSA") had denied Hooper's earlier application for SSI benefits in March 2010.  Administrative Record, Dkt. No. 12 ("AR") at 101-08.  Hooper also filed a disability claim in August, 2007, but the record contains little information about that application.  *Id.* at 296.

[2] The submission of a Joint Stipulation instead of formal motion papers is regularly utilized in the Central District of California and makes for a more streamlined presentation, enabling the Court to render its decision pursuant to Rule 12(c) of the

Accordingly, the parties filed a Joint Stipulation on May 18, 2016. *See* Joint

Stipulation dated May 17, 2016, Dkt. No. 17 ("Stip.").

## B.    The Administrative Record

### 1. Hooper's Background

Hooper, who was born in 1989, graduated from high school with an

Individualized Education Program ("IEP") diploma in 2007 and later completed a

vocational course in computers. AR at 34, 38, 376. At the time of the hearing in

November, 2013, she was separated from her husband and sharing an apartment

with her two young children, her friend, and her friend's child. *Id.* at 35-36, 58.

Later, Hooper and her children returned to live with her mother, stepfather, and

sister in a trailer home in Dover Plains, New York. *Id.* at 35, 68, 474.

The administrative record contains conflicting timelines regarding Hooper's

work history. *Id.* at 366, 410, 465. In 2008 and 2009, Hooper worked in a local

supermarket's bakery and deli departments. *Id.* at 41, 73, 300. She then worked as

a clerk at a convenience store. Hooper testified that she lost her job there after a

few months because the store's management suspected her of stealing from the cash

register. *Id.* at 40, 71. Hooper maintained that she had not stolen but instead was

unable to calculate accurate change for customers. *Id.* at 40. When she testified at

the hearing before the ALJ, Hooper was uncertain of her most recent date of

employment. *Id.* at 40, 72.

---

Federal Rules of Civil Procedure more expeditiously. *See, e.g., Polion v. Colvin*, No.
12-CV-0743 (DTB), 2013 WL 3527125 (C.D. Cal. July 10, 2013); *Gutierrez v. Astrue*,
No. 10-CV-8960 (CW), 2011 WL 3861607 (C.D. Cal. Aug. 31, 2011).

During the hearing, Hooper described her ability to perform daily tasks. *Id.* at 54-55. Hooper stated that she holds a driver license and that she transports her children to and from school in her own car. *Id.* at 37, 55. Hooper also cleans, shops for groceries, and cooks for herself and her children. *Id.* at 54.

Hooper's claims for DIB and SSI were based on mental impairments: bipolar disorder, impulse control disorder, and learning disability. *Id.* at 409.[3] To complete work tasks, Hooper testified that she needs written instructions or, alternatively, constant one-on-one supervision. *Id.* at 43. Hooper described being prone to angry emotional outbursts in daily interactions and suffering from anxiety attacks and depression. *Id.* at 58-60. At the time of her hearing, Hooper had received six prescriptions for various medications. *Id.* at 48, 825.

### 2. Medical Evidence in the Record

#### a. Treatment at Hudson River Healthcare

Hooper has been a patient at Hudson River Healthcare ("HRH") in Dover Plains, New York since at least 2005. *Id.* at 766. The record contains extensive progress notes from HRH, which are dated from July 2005 through August 2013. *Id.* at 558-767. Dr. Anna Timell was Hooper's primary-care provider at HRH although other clinicians also treated Hooper. *See, e.g., id.* at 20, 561, 702, 722. Beginning in 2012, Hooper was treated by Dr. Andy Casimir, a psychiatrist, and

---

[3] Hooper has a documented hand tremor, but physical impairments were not the basis for her applications for benefits. AR at 813, 821.

4

received behavioral health counseling from social worker Elizabeth Willis, LCSW ("Willis"). *Id.* at 580, 622.

Hooper's records from HRH document sporadic visits from 2005 until 2010 and more regular visits from 2010 through 2013. *Id.* at 558-767. From 2011 forward, Hooper's medical providers documented anxiety, depression, and mood instability. *See, e.g., id.* at 559, 657, 665, 679. In 2012, Hooper began regular behavioral health counseling and psychiatry visits with Dr. Casimir and Willis. *Id.* at 675-83. After the birth of her second child, Hooper resumed taking medication for depression. *Id.* at 669-70. Hooper and her husband separated in November 2012 amid her husband's infidelity and other family stressors. *Id.* at 633-39. Hooper continued to report anxiety, angry interactions with relatives, and mood instability in 2013. *Id.* at 583, 587, 594, 596, 598, 602. In April 2013, Willis and Dr. Casimir referred Hooper for a "higher level of care" at Hudson Valley Mental Health ("HVMH"). *Id.* at 579. After this referral, Hooper continued to receive primary care at HRH. *Id.* at 558-78.

### b. Treatment at Hudson Valley Mental Health

The administrative record also contains medical records from Hudson Valley Mental Health, where Hooper received individual therapy and medication management on and off from 2010 through 2013.[4] The HVMH records primarily consist of "Mental Health Treatment Plan Reviews," "Diagnostic Reviews," and

---

[4] When the HRH clinicians referred Hooper to HVMH in April 2013, Hooper was already a patient of HVMH but had been absent from treatment for about one year. AR at 805.

5

"Psychosocial Assessments" summarizing Hooper's progress and conditions, rather than contemporaneous progress notes documenting her visits. *See, e.g.*, *id.* at 776, 783, 795. In 2010, Hooper saw social worker Jean Simone for individual therapy two to four times per month and saw nurse practitioner Hollis Heintz for medication management once per month. *Id.* at 769. Hooper's attendance at HVMH varied between 2010 and 2013 but her treatment plan remained largely the same. *Id.* at 784, 806. In 2013, social worker Elga Maldonado replaced Willis as the provider for Hooper's individual therapy. *Id.* at 806.

Diagnostic Reviews repeatedly listed Hooper's conditions as impulse control disorder and learning disorder. *See Id.* at 772, 795, 809. A 2010 evaluation noted that she had "[s]tressors related to unemployment, educational problems, [and her] social environment." *Id.* at 824. The evaluation also detailed Hooper's psychosocial history, including physical abuse by a stepfather and a fifth-grade diagnosis of mental retardation. *Id.* at 821.

In the HVMH records, clinicians repeatedly documented Hooper's mood swings, outbursts, and strained relationships. *See, e.g., id.* at 783, 798, 810, 816. The records described Hooper's "limited ability to take stress and . . . history of impulsivity when overwhelmed." *Id.* at 788. A July 2013, treatment plan noted that Hooper "yells and throws things when she feels overwhelmed and . . . her sensitivity makes it difficult to have relationships, and hold a job." *Id.* at 805. A "Psychiatric Assessment," also from July 2013, stated that Hooper had been treated at HVMH for "mood swings, anxiety, and explosive rage" in 2011 and that at the

6

time of the assessment, her "emotional state, . . . mood swings[,] and insomnia [were] unchanged." *Id.* at 816-17.

### c. Assessments by Dr. Anna Timell

Hooper's primary-care physician from HRH, Dr. Anna Timell, filled out five SSA questionnaires about Hooper between 2010 and 2012.[5] *Id.* at 478-89, 511-14, 527-33, 554-55. Dr. Timell declined to complete the first form in February 2010 and instead noted on the first page: "I have no reason to believe she is disabled in any way." *Id.* at 478. In a "Medical Examination for Employability Assessment, Disability Screening, and Alcoholism/Drug Addiction Determination" form dated October 25, 2011, Dr. Timell listed Hooper's medical conditions as impulse control disorder and learning disability. *Id.* at 511. She indicated that Hooper's limitations as to work activities included "[c]rowded or fast pace[d] work," and "[t]hought intensive work." *Id.* at 512. Dr. Timell also completed charts that divided potential physical and mental functional limitations into "No Evidence of Limitations," "Moderately Limited," and "Very Limited." *Id.* She noted no evidence of limitations for any category of physical functioning and no evidence of limitations for most questions about mental functioning. *Id.* Dr. Timell found Hooper to be "[m]oderately [l]imited" in her ability to "maintain[] socially appropriate behavior without exhibiting behavior extremes" and "function in a work setting at a consistent pace." *Id.*

---

[5] The 2010 and 2011 forms predate the 2012 application for benefits and Dr. Timell presumably submitted them for purposes of Hooper's 2010 application for benefits. AR at 302-11.

7

The record contains a different and inconsistent assessment form that Dr. Timell completed and signed but did not date. *Id.* at 513-14. The ALJ describes this form as dating to October 2011—perhaps because the form indicates that Hooper's last examination took place that month—but it is not clear from the face of the form when Dr. Timell completed it. *Id.* at 22, 513-14. In this form, Dr. Timell listed Hooper's medical condition as bipolar disorder and wrote that she was "not aware of any limitations [on work activities] per se." *Id.* at 513-14. With regard to the functional limitation charts, Dr. Timell again found no evidence of limitations in any category of physical functioning. *Id.* at 514. For questions about mental functioning, Dr. Timell wrote "do not know," even though she responded to the questions on the October 25, 2011 form. *Id.*

In April 2012, Dr. Timell again declined to complete a questionnaire but made a notation on the first page: "[Hooper] tells me she has bipolar disorder. I have no documentation to support this. I believe she may be cognitively handicapped." *Id.* at 527. Finally, in December 2012, Dr. Timell submitted a "Medical Source Statement of Ability to do Work-Related Activities (Mental)" form. *Id.* at 554. Instead of completing a chart describing Hooper's restrictions for work-related mental activities, Dr. Timell wrote, "I am unable to fill this out. [Hooper] clearly has mild intellectual disability . . . but needs complete neuropsych testing." *Id.*

8

### d. Assessments from Non-Examining Psychologists

The administrative record contains several assessments from psychological examiners employed by the New York State Office of Temporary and Disability Assistance. *Id.* at 491-508, 536-49. After Hooper applied for DIB and SSI in March 2010, psychologist L. Hoffman reviewed the "allegations, opinions, medical evidence, and lay information" in Hooper's file and completed a "Psychiatric Review Technique" and "Mental Residual Functional Capacity Assessment." *Id.* at 507, 491-508. Hoffman observed that "despite a severe psychiatric impairment, [Hooper] is able to understand and remember simple instructions, sustain attention and concentration for simple tasks, respond and relate adequately to others, and adapt to simple changes." *Id.* at 507. At the time of Hooper's 2010 application, which is not part of the administrative record, she had not yet received psychiatric treatment. *Id.* ("[Hooper] has no history of psychiatric treatment apparent in records."). Thus, Hoffman's evaluation could not account for Hooper's complete medical records, including psychiatric treatment notes, which extend through the summer of 2013. *See, e.g., id.* at 559, 805.

In May 2012, soon after Hooper again applied for benefits, R. Petro completed a Psychiatric Review Technique. *Id.* at 536-49. Petro found that there was "[i]nsufficient [e]vidence" to reach a "Medical Disposition" about the severity of Hooper's impairments and did not assess Hooper's impairments or functional limitations. *Id.* at 536-49. Like Hoffman, Petro based his review on a partially developed medical record because he did not consider the treatment records that

9

Hooper submitted after her August 2013 hearing. *Id.* at 81. Therefore, neither opinion from a non-examining source takes into account medical evidence produced later in the adjudicative process. *Id.* at 23.

### e. Employability Assessment Letters

The record includes eight statements from friends, family, and a social worker, each of whom certifies that he or she has "witnessed [Hooper's] inability to maintain employment although she has tried to work." *Id.* at 515-22. Of these eight statements, only three include personalized and specific observations about Hooper. *Id.* at 516, 519, 521. For example, Kara Boivin, a social worker with Dutchess County Community Action, stated that she had known Hooper during her employment at the convenience store and that "[Hooper] became overwhelmed easily with job responsibilities and customers. She has a hard time comprehending what is told to her as far as directions and tasks." *Id.* at 521.

### 3. School Records

The administrative record includes extensive education records. *Id.* at 312-56, 372-94. Pamela O'Neil, who served as the Director of Special Education at Dover Union Free School District and who knew Hooper for ten years before her graduation in 2007, completed a teacher questionnaire produced by the New York State Office of Temporary and Disability Assistance in 2010. *Id.* at 313-20. O'Neil indicated that Hooper had "obvious" or "serious" problems in eight of ten categories concerning Hooper's ability to use and acquire information. *Id.* at 314. According to O'Neil, Hooper had "no problem" or only "a slight problem" attending to and

10

completing tasks. *Id.* at 315. O'Neil further indicated that Hooper had "no problem" interacting with and relating to others. *Id.* at 315-16. On the final page, O'Neil noted that Hooper has "very poor processing skills and working memory. She is a very hard worker and pleasant young woman. She has limited academic ability and poor cognitive skills. She has matured a great deal over the years." *Id.* at 319.

Hooper's school records include various psychological and educational evaluations. *Id.* at 331-47, 374-94. For example, in 2007, during Hooper's senior year of high school, her Verbal IQ score was 73 (fourth percentile) and her Full Scale IQ score was 69 (second percentile). *Id.* at 335. Both scores fall within the range of borderline intellectual functioning. *Id.* Hooper's 2007 "Graduation Document" notes that she "has a multi-sensory learning style" and "demonstrates difficulty in integrating and synthesizing materials." *Id.* at 323. The document also included a note about Hooper's intention to participate in vocational training and plan for future employment. *Id.*

### 4. ALJ Hearing

Hooper appeared before the ALJ without representation on July 1, 2013. *Id.* at 84. She testified that she had not read the SSA mailing advising her of her right to representation. *Id.* at 87-89. The ALJ granted an adjournment to give Hooper time to engage a representative. *Id.* at 92. Hooper next appeared before ALJ on August 20, 2013, with counsel. *Id.* at 64. Hooper testified briefly about her marital status, education, employment history, and daily activities. *Id.* at 66-74. When the

11

ALJ asked Hooper what would prevent her from "doing any kind of work whatsoever," she testified that she had memory problems, that she needed one-on-one supervision, and that she was prone to "jump down your throat for nothing," "yell at people," and "blurt out" things. *Id.* at 73-74.

The ALJ expressed concern that the medical records before him were incomplete. *Id.* at 79-80. Hooper's counsel indicated that due to his recent retention, he had not had time to secure complete records. *Id.* at 80. The ALJ gave Hooper's counsel three weeks to enlarge the record. *Id.* at 81.

Hooper's hearing before the ALJ continued on November 26, 2013. *Id.* at 30. Hooper was the only person to testify. *Id.* at 30-63. The ALJ again elicited testimony about Hooper's background and work history. *Id.* at 30-41. With regard to her daily activities, she testified that she drives her own car and transports her children to and from school. *Id.* at 54-55. She further testified that she cooks, cleans, and shops for groceries. *Id.* at 54. When asked why she could not perform any work, Hooper stated that she could "go out there and work right now," but needs supervisors to write down all instructions and requires constant guidance and assistance throughout a shift. *Id.* at 43-44.

The ALJ asked about Hooper's medications and she testified that they calm her and help her not to "flip out on the stupidest comments people make." *Id.* at 49. The ALJ noted that her medical records contained no corroboration of a bipolar disorder diagnosis. *Id.* at 45. Hooper disagreed with the ALJ's observation and stated, "I don't know . . . I have bipolar. My whole family has bipolar." *Id.* Hooper

12

expressed uncertainty when asked about what she had eaten in the previous days and testified that she has trouble remembering things. *Id.* at 52-53. Finally, Hooper's attorney questioned her on the record and Hooper described her experiences with depression, anxiety, and emotional outbursts toward friends and family. *Id.* at 58-62.

## II.   DISCUSSION

### A.   Standard of Review

#### 1. Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales.* 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "'the reviewing court is required to examine the entire record. . . .'" *Selian,* 708 F.3d at 417 (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the

13

pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without

remanding . . . for a rehearing." 42 U.S.C. § 405(g). Remand is "particularly

appropriate where, due to inconsistencies in the medical evidence and/or significant

gaps in the record, 'further findings would . . . plainly help to assure the proper

disposition of [a] claim.'" *Kirkland v. Astrue,* No. 06-CV-4861 (ARR), 2008 WL

267429, at *8 (E.D.N.Y. Jan. 29, 2008) (quoting *Butts,* 388 F.3d at 386).

### 2.  Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or

mental impairments must be "of such severity that [the claimant] is not only unable

to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the

national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing whether a claimant's impairments meet the statutory definition

of disability, the Commissioner "must make a thorough inquiry into the claimant's

condition." *Mongeur,* 722 F.2d at 1037. Specifically, the Commissioner's decision

must take into account factors such as: "(1) the objective medical facts; (2) diagnoses

or medical opinions based on such facts; (3) subjective evidence of pain or disability

14

testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a. Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue*, 729 F.3d 172, 173 n.1 (2d Cir. 2013). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is unemployed, at the second step the Commissioner determines whether the claimant has a "severe impairment" restricting her ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has a severe impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix 1 of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is considered disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner continues to the fourth step and determines whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant can do any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps. *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir. 2008). The burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the

ability to perform some work in the national economy. *See Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir. 2009). Ordinarily, the Commissioner satisfies the burden by relying on the applicable medical vocational guidelines. *See Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir. 1999). Known as the "Grids," these guidelines "'take into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience'" to decide an applicant's capacity for work. *Id.* (internal alteration omitted). However, when the claimant suffers from solely nonexertional impairments, "exclusive reliance on the Grids is inappropriate." *Correale–Englehart v. Astrue,* 687 F. Supp. 2d 396, 421 (S.D.N.Y. 2010) (citing *Butts,* 388 F.3d at 383).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel,* 530 U.S. 103, 110-11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record." *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citation omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims,* 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to "develop a complete medical record before making a disability determination." *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d)-(f)).

Whether the ALJ has met his duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is

16

supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue,* No. 09-CV-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart,* No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law."). The ALJ must develop the record even where the claimant has legal counsel. *Perez,* 77 F.3d at 47. Remand is appropriate where this duty is not discharged. *See, e.g ., Moran,* 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c. Treating Physician Rule

"'Regardless of its source,' the ALJ must 'evaluate every medical opinion' in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue,* No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (quoting 20 C.F.R. §§ 404.1527(c), 416.927(c)). A treating physician's opinion receives controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The regulations define a

17

treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Deference to such a medical provider is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is not always controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue,* No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011); *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). Additionally, where "'the treating physician issue[s] opinions that [are] not consistent with other substantial evidence in the record, such as the opinion of other medical experts,' the treating physician's opinion 'is not afforded controlling weight.'" *Pena ex rel. E.R.,* 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004) (alteration in original); *see also Snell,* 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

18

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian,* 708 F.3d at 420 (quoting *Burgess,* 537 F.3d at 129); *see Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to the duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue,* No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *adopted by,* 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran,* 362 F.3d at 32; *see* 20 C.F.R. § 404.1527(c)(2). If, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned to the treating source. *Halloran,* 362 F.3d at 33;

*accord Snell,* 177 F.3d at 133 (responsibility of determining "the ultimate issue of disability" does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (citing *Schaal,* 134 F.3d at 505; 20 C.F.R. § 404.1527(d)(2)). The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician. *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted). Indeed, "[c]ourts have not hesitated to remand cases when the Commissioner has not provided 'good reasons.'" *Pena ex rel. E.R.,* 2013 WL 1210932, at *15 (quoting *Halloran,* 362 F.3d at 33) (alterations omitted).

## B.   ALJ's Decision

In his March 20, 2014 decision, the ALJ determined that Hooper did not meet the statutory definition of disability under the Social Security Act and denied her claims for DIB and SSI. AR at 24. Applying the five-step inquiry, the ALJ first determined that Hooper had not been engaged in substantial gainful activity since January 1, 2008.[6] *Id.* at 16. At step two, the ALJ found that Hooper had the following severe impairments: bipolar disorder, impulse control disorder, and a learning disability.[7] *Id.*

---

[6] The ALJ cited the 2008 onset date in his decision although Hooper's counsel had amended the onset date to January 1, 2009, and the ALJ mentioned this amendment during the November 26, 2013 hearing. AR at 14, 40, 469.

[7] The ALJ listed bipolar disorder as a severe impairment although there is no diagnosis of this disorder in the medical record. AR at 16. Dr. Timell explicitly noted the lack of documentation in a statement, and the ALJ acknowledged this inconsistency during an oral hearing. *Id.* at 45, 527.

20

At step three, however, the ALJ found that Hooper did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR at 17. In completing step three, the ALJ assessed whether the severity of Hooper's impairments met the requirements of listing 12.05: "Intellectual disability." *Id.* Listing 12.05 has a threshold diagnostic requirement of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," meaning before age 22. 20 C.F.R. Pt. 404, Subpt. P., App'x. 1, § 12.05. Listing 12.05 also contains "paragraphs," or "sets of criteria." 20 C.F.R. Pt. 404, Subpt. P., App'x. 1, § 12.00. "If [the] impairment satisfies the diagnostic description . . . and any one of the four sets of criteria," the ALJ will find that a claimant's impairment meets the listing and that the claimant is disabled without further inquiry. *Id.* "Paragraphs A and B contain criteria that describe disorders [that are] severe enough to prevent [a claimant's] doing any gainful activity without additional assessment of functional limitations." *Id.*

Here, the ALJ found that despite having an IQ that placed her in the range of significantly subaverage intellectual functioning, Hooper did not have the deficits in daily functioning to meet the listing's threshold diagnostic requirement. AR at 18. The ALJ also considered the criteria in Paragraphs C and D, AR at 17-18, assessing how the functional limitations resulting from Hooper's impairments limited her "physical or mental ability to do basic work activities." 20 C.F.R. Pt. 404, Subpt. P.,

21

App'x. 1, § 12.00. The ALJ found that Hooper's impairments did not meet or equal Paragraph C, which requires a full scale IQ of 60 through 70 and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P., App'x. 1, § 12.05(C). Paragraph D requires a full scale IQ of 60 through 70, resulting in at least two of four criteria: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt. P., App'x. 1, § 12.05(D). The ALJ determined that Hooper's mental impairments did not cause at least two of the Paragraph D criteria. AR at 17-18. Upon completing this analysis, the ALJ observed that despite a reported "history of learning difficulties from a young age, the evidence fails to demonstrate significant deficits in daily functioning," and concluded that Hooper's impairments did not produce "listing-level severity or equivalence." *Id.* at 18.

The ALJ proceeded to step four and determined that Hooper had the RFC to perform a full range of work at all exertional levels, with the nonexertional limitation of performing only simple, routine, and repetitive tasks. AR at 18-19. The ALJ found that Hooper did not have the RFC to perform her past relevant work as a cashier or a deli and bakery assistant. *Id.* at 23. He further found that despite an IQ in the borderline range, "the evidence indicates that the claimant is not as limited as these evaluation scores suggest." *Id.* at 19. In reaching these

conclusions, the ALJ referred to the progress notes from HRH in Hooper's medical record.[8]  *Id.*

In addition, the ALJ noted that because Hooper interacted well with physicians and therapists over the course of her treatment, "diminished intellectual skills were not . . . any bar in her ability to comprehend, remember or carry out instructions." *Id.* He found that Hooper had no significant limitations in adaptive functioning because she drove, completed household tasks, and cared for her children. *Id.* at 19-20. With regard to Hooper's anxiety and mood problems, the ALJ observed that "medication successfully stabilized the claimant's mental functioning." *Id.* at 20. Although she could not take the medications during her pregnancies, "once her pregnancies ended, the claimant resumed taking medication and her mental status quickly improved." *Id.* (citation omitted).

The ALJ described treatment records from Dr. Casimir and Dr. Timell as showing "fairly benign" problems and failing "to identify any significant disturbance in mood, thought process, focus, or significant restriction in functioning." *Id.* Additionally, the ALJ determined that Dr. Casimir's records indicated that Hooper's reactive behaviors were mainly directed at her husband during a period of turmoil in their marriage. *Id.* The ALJ found that although Hooper had difficulty with complex tasks, the records did not "set forth any specific limitations in mental functioning." *Id.* at 21. Due to these findings, the ALJ determined that Hooper's

---

[8] At step four, the ALJ did not refer to the treatment records from HVMH. *Id.* at 19-23.

statements about the "intensity, persistence and limiting effects of [her] symptoms" were inconsistent with the RFC assessment and her symptoms were not severe or persistent enough to "preclude the performance of all levels of activity on a sustained basis." *Id.* at 21-22.

The ALJ assigned varying weight to the opinion evidence in the administrative record. *Id.* at 22. With regard to the assessments from Dr. Timell, all but one of the statements received some weight because they were "consistent with the large range of functional ability demonstrated in the evidence." *Id.* The ALJ highlighted Dr. Timell's notations that she was "not aware of any limitations per se" and the fact that Dr. Timell listed bipolar disorder as a condition but noted no evidence of "limitations in making simple decision[s], interacting appropriately with others and maintaining socially appropriate behavior."[9] *Id.* Dr. Timell's April, 2012 statement about the lack of documentation for allegations of bipolar disorder received little weight because it "did not assess any functional restrictions, but merely indicated that the claimant 'may be cognitively handicapped.'" *Id.*

The ALJ gave some weight to evaluations from Pamela O'Neil, the special education administrator, because the evidence corroborated a history of "some intellectual deficits, even if it fail[ed] to support the presence of associated debilitating restriction[s]." *Id.* at 22. The ALJ gave little weight to social worker Kara Boivin's form statement and personalized note describing Hooper's difficulties

---

[9] The ALJ conflated these statements and represented both as appearing in the October 2011 assessment. As noted above, one form is dated October 25, 2011, while a similar form with conflicting responses is undated. AR at 511-14.

at work because the "[r]ecords . . . fail to demonstrate findings which are consistent

with [the] profound functional limitations in comprehension and stress tolerance"

that Boivin reported. *Id.* at 22, 521. The other form statements from friends and

relatives also received little weight because the ALJ found them to be inconsistent

with evidence of Hooper's "generally stable condition and full daily living activities."

*Id.* at 23. The ALJ also gave little weight to the state psychological evaluations,

finding that they had minimal "probative value" because they took place before the

submission of additional medical records during the adjudicative process. *Id.* at 22-

23.

Finally, at step five, the ALJ relied on the Grids to find that a "significant

number" of jobs existed in the national economy that Hooper could perform. *Id.* at

23. The ALJ observed that nonexertional limitations restricted Hooper's capacity to

perform work at all exertional levels but "these limitations have little or no effect on

the occupational base of unskilled work at all exertional levels." *Id.* at 24. The ALJ

concluded that Hooper was not disabled. *Id.*

## C.   Analysis

Hooper contends that the ALJ erred by finding that Hooper's impairments

did not meet the requirements of listing 12.05, by failing to complete the record, by

making an RFC assessment that was not supported by substantial evidence, and by

deciding her case under the Grids and without vocational testimony. Stip. at 7.

The Court concludes that, while there is substantial evidence to support the ALJ's

step three determination, the ALJ failed to fully develop the administrative record

25

at step four. Because the Court remands for this deficiency, it need not review the

ALJ's exclusive reliance on the Grids at step five. *See, e.g., Randolph v. Colvin*, No.

12-CV-8539 (JLC), 2014 WL 2938184, at *13 (S.D.N.Y. June 30, 2014) (court need

not reach step five given basis for remand at earlier step).

### 1. The ALJ's Step Three Determination is Supported by Substantial Evidence

The ALJ's conclusion that Hooper did not have an impairment or

combination of impairments that met or equaled the criteria for listing 12.05 is

supported by substantial evidence. According to listing 12.05, "[i]ntellectual

disability refers to significantly subaverage general intellectual functioning with

deficits in adaptive functioning initially manifested during the developmental

period." 20 C.F.R. Pt. 404, Subpt. P., App'x. 1, § 12.05. "If [an] impairment satisfies

the diagnostic description in the introductory paragraph and any one of the four

sets of criteria [in Paragraphs A through D, the ALJ] will find that [the]

impairment meets the Listing." 20 C.F.R. Pt. 404, Subpt. P., App'x. 1, § 12.00.

Thus, before the ALJ reaches the criteria in Paragraphs A through D, a claimant

must meet the threshold of having cognitive limitations and deficits in adaptive

functioning initially manifesting before age 22. *See, e.g., Burnette v. Colvin*, 564 F.

App'x 605, 607 (2d Cir. 2014); *Talavera v. Astrue*, 697 F.3d 145, 153 (2d. Cir. 2012).

Adaptive functioning refers to a claimant's "ability to cope with the challenges of

ordinary everyday life." *Talavera*, 697 F.3d at 153 (quoting *Novy v. Astrue*, 497 F.3d

708, 710 (7th Cir. 2007)) (internal alterations omitted). "[A]n applicant's

inadequate adaptive functioning must arise from her cognitive limitations, rather

than from a physical ailment or other infirmity." *Id.* Courts have held that a claimant who "is able to satisfactorily navigate activities such as living on [her] own, taking care of children without help sufficiently well that they have not been adjudged neglected, paying bills, and avoiding eviction . . . does not suffer from deficits in adaptive functioning." *Id.* (internal quotation marks and alterations omitted).

The ALJ properly found that Hooper met the cognitive limitation requirement of Listing 12.05 because her full scale IQ score of 69 placed her intellectual functioning in the borderline range. AR at 18, 335. However, the ALJ found that despite "a history of learning difficulties from a young age," Hooper did not have sufficient deficits in daily adaptive functioning to satisfy the threshold requirement of Listing 12.05. AR at 18.

Hooper contests this assessment, contending that her inconsistent employment record, difficulties with work tasks, need for help from family with childcare, history of impulsive outbursts, and confusion when asked about the documents she received in the mail before her hearing are evidence of deficits in adaptive functioning. Stip. at 8-9. These struggles, however, fail to demonstrate an inability to cope with daily life. Indeed, Hooper's testimony and submissions to the state agency show that she is able to "satisfactorily navigate" paying bills, shopping for groceries, cooking, cleaning, and driving her own car. *Talavera*, 697 F.3d at 153; AR at 37, 54-55, 401. At the time of her final appearance before the ALJ, Hooper was the primary caretaker of two young children, and she regularly drove them to

27

and from school in her own car. AR at 35, 37-38, 54. The need for occasional help

with daily tasks does not negate a claimant's adaptive functioning. *See Burnette*,

564 F. App'x at 608 ("although [the claimant] reported sometimes needing help with

cooking, cleaning, and laundry, she has nevertheless been able to live alone, obtain

a driver's license, take public transportation, shop for food, and pay her bills.").

Despite Hooper's cognitive limitations, the Court finds that there is no evidence in

the record to suggest that her deficits in adaptive functioning are sufficiently severe

to reach the threshold requirement in listing 12.05. Therefore, the ALJ's step three

determination is upheld.

### 2. The ALJ Failed to Fully Develop the Administrative Record at Step Four

At step four, the ALJ failed to fully develop the evidentiary record given the

lack of medical opinion evidence before him. Specifically, the ALJ failed to obtain a

comprehensive assessment of the functional limitations caused by Hooper's mental

impairments from any treating or consultative physician. The Court cannot

conclude that the ALJ evaluated Hooper's RFC at step four with a complete record.

The RFC assessment is an adjudicator's finding of "the most [a claimant] can

still do [in a work setting] despite [her] limitations." 20 C.F.R. § 404.1545(a); *see*

*also* SSR 96-5p, 1996 WL 374183 (July 2, 1996). An ALJ considers medical source

statements and all other evidence in the case record in making an RFC finding.

SSR 96-5p, 1996 WL 374183 (July 2, 1996). A medical source statement is an

evaluation from a treating physician or consultative examiner of "what an

individual can still do despite a severe impairment, in particular about an

28

individual's physical or mental abilities to perform work-related activities on a

sustained basis." *Id.* It is an ALJ's responsibility to "develop [the claimant's]

complete medical history, including arranging for a consultative examination if

necessary, and mak[e] every reasonable effort to help [the claimant] get medical

reports from [her] own medical sources." 20 C.F.R. § 404.1545(a)(3) (citing 20

C.F.R. § 404.1512(d-f)). "In light of the special evidentiary weight given to the

opinion of the treating physician . . . the ALJ must 'make every reasonable effort to

obtain not merely the medical records of the treating physician but also a report

that sets forth the opinion of the treating physician as to the existence, the nature,

and the severity of the claimed disability.'" *Molina v. Barnhart*, No. 04-CV-3201

(GEL), 2005 WL 2035959, at *6 (S.D.N.Y. Aug. 17, 2005) (quoting *Peed v. Sullivan*,

778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)).

The record contains five statements from Hooper's primary-care physician,

Dr. Anna Timell of HRH. AR at 478-89, 511-14, 527-33, 554-55. Since at least

2008, Dr. Timell has treated Hooper for routine complaints such as injuries, body

aches, and infections. *See, e.g., id.* at 562, 589, 755. Although Dr. Timell was aware

of Hooper's impulse control disorder and learning disability and she sometimes

made referrals for mental health services, Dr. Timell did not personally provide

Hooper with any counseling or psychiatric care. *See, e.g., id.* at 660 (documenting

referral for marital counseling). For those services, Hooper saw others at HRH and

HVMH, including psychiatrist Dr. Andy Casimir, nurse practitioner Hollis Heintz,

and social workers Jeane Simone and Elizabeth Willis. *See, e.g., Id.* at 583, 602,

769. At HRH, Hooper saw Dr. Casimir twelve times between June, 2012 and April, 2013. *Id.* at 581, 596, 602, 627, 633, 637, 647, 663, 669, 671, 673, 675. She saw Willis 26 times between May, 2012 and April, 2013. *Id.* at 579, 583, 585, 587, 592, 594, 599, 600, 604, 616, 623, 625, 629, 631, 635, 639, 645, 649, 651, 653, 665, 667, 677, 679, 681, 683. Progress notes from Dr. Casimir and Willis indicate their familiarity with Hooper's day-to-day personal life, coping skills, and reactions to psychiatric medications. *See, e.g., id.* at 629, 637, 651, 665, 673. The treatment plans and diagnostic reviews from HVMH establish that the social workers and nurse practitioner there also knew about Hooper's family life and communication style. *See, e.g., id.* at 768, 791, 805, 816.

Because Hooper's impairments include impulse control disorder and learning disability and because Hooper received extensive care for those impairments from other providers, the Court does not believe that Dr. Timell qualifies as Hooper's treating physician for purposes of the disabilities alleged here. *See, e.g., Schisler v. Sullivan*, 3 F.3d 563, 569 (2d Cir. 1993) (defining a treating source as the claimant's "own physician, osteopath or psychologist . . . who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual. The nature of the physician's relationship with the patient . . . is determinative"); *Swan v. Astrue*, No. 09-CV-0486-S, 2010 WL 3211049 at *5 (W.D.N.Y. Aug. 11, 2010) (declining to accord controlling weight to the opinion of a primary-care physician who saw the claimant for "general checkups [and] immunizations," but not the "cognitive and

psychological impairments at issue"); 20 C.F.R. § 404.1527(c) ("[T]he more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.").

Further, the apparent uncertainty, contradictions, and incomplete information in Dr. Timell's assessments demonstrate her limited knowledge of Hooper's severe mental impairments and functional limitations. In one statement, Dr. Timell included bipolar disorder as one of Hooper's medical conditions, yet in another she wrote that she lacked documentation to corroborate the diagnosis. *Id.* at 513, 527. In her October 25, 2011 assessment, Dr. Timell completed each section of the mental functional limitations chart and listed Hooper's limitations as to "[c]rowded or fast pace[d] work," and "thought intensive work." *Id.* at 512. In contrast, on the undated form, Dr. Timell wrote "do not know" next to four categories that she had assessed in the other form. *Id.* at 514. Also, unlike her response on the October 25, 2011 form, Dr. Timell wrote on the undated form that she was "not aware of any limitations per se." *Id.* On a December, 2012 evaluation of Hooper's mental ability to do work-related activities, Dr. Timell stated, "I am unable to fill this out. [Hooper] clearly has mild intellectual disability . . . but needs complete neuropsych testing." *Id.* at 554.

Even if Dr. Timell qualified as a treating physician for purposes of Hooper's alleged disabilities, the ALJ failed to follow up on the many discrepancies in her statements and instead framed her opinions as consistent with a lack of functional restrictions throughout the record. AR at 22. In *Sigmen v. Colvin*, No.

31

13-CV-0268, 2015 WL 5944254, at *5 (E.D.N.Y. Oct. 13, 2015), the court remanded

because the ALJ should have clarified a treating physician's "amorphous"

statements and looked into ambiguities in his opinion rather than "infer[ring]" that

a statement supported the ability to perform a certain level of employment. Here,

the ALJ did not address Dr. Timell's inconsistent assessment of Hooper's functional

limitations or conflicting notations about bipolar disorder.  Further, the ALJ

apparently interpreted Dr. Timell's failure to specify new functional limitations to

amount to a professional opinion that no such limitations existed. *Id.  See Jermyn

v. Colvin*, No. 13-CV-5093 (MKB), 2015 WL 1298997, at *20 (E.D.N.Y. Mar. 23,

2015) ("[T]he ALJ was not permitted to construe the silence in the record as to

Plaintiff's functional capacity as indicating support for his determination as to

Plaintiff's limitations") (citing *Rosa*, 168 F.3d at 81).  In defending the ALJ's

decision, the Commissioner selectively interprets Dr. Timell's statements,

describing her as "declin[ing] to assess any specific limitations," Stip. at 31, even

though Dr. Timell unambiguously noted on the forms that she lacked enough

information to adequately measure Hooper's limitations.[10]  AR at 554.

The gaps and inconsistencies in Dr. Timell's reports and the fact that she did

not treat Hooper's mental impairments should have signaled to the ALJ that the

record lacked a comprehensive medical statement from a treating physician.

---

[10] Specifically, the Commissioner states: "As found by the ALJ, Dr. Timell's reports, while not specific, are consistent with the overall record showing that Plaintiff was able to perform simple, repetitive, and routine tasks." Stip. at 31 (citing AR at 22-23).

Nonetheless, the record reflects that the agency only made one attempt to obtain

evaluations from other providers. *Id.* at 448-61. Specifically, in December, 2012,

the SSA's Office of Disability Adjudication and Review requested assessments from

the three providers listed on Hooper's Disability Report: Dr. Timell, social worker

Jean Simone, and nurse practitioner Hollis Heintz. *Id.* at 440-61, 466. Although

Simone and Heintz never responded, there is no evidence of any follow-up by the

agency. Moreover, even after reviewing Hooper's medical records, the ALJ never

sought the opinions of Dr. Casimir and social worker Willis of HRH. Although only

Dr. Casimir qualifies as an "acceptable medical source" under 20 C.F.R. §

404.1513(c), assessments from the nurse practitioner and social workers would have

provided additional insight to inform the ALJ's decision. *See* SSR 06-03p, 2006 WL

2329939 (Aug. 9, 2006) ("[W]e may use evidence from 'other sources' . . . to show the

severity of the individual's impairments and how [they affect] the individual's

ability to function.") (quoting 20 C.F.R. § 404.1513(d)). However, there is no

evidence the ALJ sought this input after the agency's original pre-hearing requests.

AR at 440-61.

The Second Circuit has held that an ALJ's failure to obtain a medical source

statement from a treating physician before making a disability determination is not

necessarily an error requiring remand. *Tankisi v. Comm'r of Social Sec.*, 521 F.

App'x 29, 34 (2d Cir. 2013); *see also Swiantek v. Comm'r of Social Sec.* 588 F. App'x

82, 84 (2d Cir. 2015) ("[T]his Court does not always treat the absence of a medical

source statement from a claimant's treating physicians as fatal to the ALJ's

determination."). The inquiry into the need for a treating physician's opinion hinges on the "circumstances of the particular case, the comprehensiveness of the administrative record," and "whether . . . [the record,] although lacking the opinion of [the] treating physician, was sufficiently comprehensive to permit an informed finding by the ALJ." *Sanchez v. Colvin*, No. 13-CV-6303 (PAE), 2015 WL 736102, at *5-6 (S.D.N.Y. Feb. 20, 2015) (citing *Tankisi*, 521 F. App'x at 33-34). The lack of a medical source statement does not render a medical record incomplete under 20 C.F.R. § 404.1513(b)(6). But for an ALJ to make a disability determination without seeking any treating physician opinion, there must be "no obvious gaps in the administrative record," and the ALJ must "[possess] a 'complete medical history.'" *Rosa*, 168 F.3d at 83 n.5 (quoting *Perez*, 77 F.3d at 48).

In *Tankisi*, the Second Circuit found that despite the lack of a formal opinion about the claimant's RFC from a treating physician, a "voluminous" medical record provided the ALJ with sufficient information to make an informed finding about the claimed disability. *Tankisi*, 521 F. App'x at 34. That record included an informal assessment of the claimant's limitations from a treating physician, opinions from at least two consulting physicians, and an assessment from a state disability examiner. *Id.* at 34; *see also Duran v. Colvin*, 14-CV-4681 (AJP), 2015 WL 4476165, at *9 (S.D.N.Y. July 22, 2015) (finding the ALJ sufficiently developed the record where there was no formal treating physician opinion but the record included treatment notes, the claimant's testimony, "a visit to a medical expert, [and] the opinions of two consultative physicians"); *Weed Covey v. Colvin*, 96 F. Supp. 3d 14,

34

24-30 (W.D.N.Y. Apr. 6, 2015) (declining to remand where ALJ did not seek opinions from treating sources but the record included statements from both examining and non-examining consultative physicians); *Gardner v. Colvin*, No. 13-CV-787 (JTC), 2014 WL 5149702, at *1, 6 (W.D.N.Y. Oct. 14, 2014) (declining to remand for failure to seek a treating source's RFC assessment where the record included other opinions from treating medical sources, medical records, reports of diagnostic imaging, and medical expert testimony).

Courts have distinguished *Tankisi* and remanded where the medical record available to the ALJ is not "robust" enough to obviate the need for a treating physician's opinion. *Sanchez*, 2015 WL at 736102, at *7; *see also Sigmen*, 2015 WL 5944254, at *5 (noting that *Tankisi* and *Swiantek* do not necessarily "preclude remand where an ALJ fails to request an opinion."). In *Downes v. Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015), this Court found that although the evidentiary record contained treatment notes, test results, and "direct assessments of [the claimant's] functional capacities" from consultative physicians, the ALJ could not have made an informed determination without the treating physicians' medical opinions. Similarly, in *Sanchez*, even though the record included at least two consulting physicians' opinions, the record was a "far cry from that in *Tankisi* and similar cases, which have excused the ALJ's failure to seek a treating physician opinion based on the completeness and comprehensiveness of the record." 2015 WL at 736102, at *6. Indeed, the *Sanchez* court observed that the "failure to obtain the treating psychiatrist's opinion was a

gaping hole" in the record. *Id.* at 7. *See also Moreira v. Colvin*, No. 13-CV-4850
(JGK), 2014 WL 4634296, at *7 (S.D.N.Y. Sept. 15, 2014) (remanding where the
ALJ failed to resolve "gaps and inconsistencies" in the medical record and heavily
relied on a consultative examiner's report rather than seeking a treating physician's
opinion).

Here, in at least one important respect, the administrative record is less
developed than in *Downes, Sanchez, Moreira*, and other cases because the ALJ did
not have a current opinion from even one consultative examiner, let alone from a
treating physician. The ALJ appropriately gave little weight to the two opinions in
the record from non-examining state psychologists because they did not account for
the entirety of Hooper's medical record, which was completed later in the
adjudicative process.[11] *Id.* at 23, 491-508, 536-49. Thus, the only medical opinion in
the record was from Dr. Timell, a primary-care physician who had insufficient
information to assess the limitations resulting from Hooper's mental impairments.

If the ALJ could not obtain sufficient information from Hooper's own medical
sources, he could have commissioned a new consultative examination to ensure
there was *some* medical opinion in the record. 20 C.F.R. § 404.1517. The ALJ has
the discretion to obtain a consultative examination "on an individual case basis"
and may do so "to try to resolve an inconsistency in the evidence, or when the

---

[11] Unlike here, in *Downes, Sanchez, and Moreira*, all consultative assessments in the
record took place as part of the claimants' active applications for benefits and did
not predate the enlargement of the medical records. *Downes,* 2015 WL 4481088, at
*3-4; *Sanchez,* 2015 WL 736102, at *6; *Moreira,* 2014 WL 4634296, at *2.

evidence as a whole is insufficient to allow [him] to make a determination or decision on [the] claim." 20 C.F.R. § 404.1519-1519(a). Nonetheless, rather than obtain a consultative examination or seek comprehensive medical opinions from the treating physicians, the ALJ made Hooper's disability determination based on a record devoid of any truly complete medical opinion. This constituted an error that requires remand. *See, e.g.*, *Staggers v. Colvin*, No. 3:14-CV-717 (JCH), 2015 WL 4751123, at *3 (D. Conn. Aug. 11, 2015) ("[C]ourts have upheld an ALJ's RFC finding only where the record is clear and, typically, where there is *some* useful assessment of the claimant's limitations from a medical source."); *Haymond v. Colvin*, No. 11-CV-631 (MAT), 2014 WL 2048172, at *7-8 (W.D.N.Y. May 19, 2014) (remanding in part because "no psychiatrist, psychologist, social worker, or counselor examined Plaintiff and gave an opinion regarding the functional limitations caused by her multiple and long-standing mental impairments. . . . [T]he record contains no assessment from an examining provider, much less a treating source, quantifying Plaintiff's mental limitations.").

Additionally, although the ALJ extensively referred to Hooper's progress notes from HRH and HVMH in explaining his RFC determination, the ALJ's own interpretation of the treatment notes does not supersede the need for a medical source to weigh in on Hooper's functional limitations.[12] AR at 20-22. *See Ramos v.*

---

[12] According to the ALJ, "[n]either the records from Dr. Timell, or the treatment records from Dr. Casimir and social worker Willis set forth any specific limitations in mental functioning. . . . [T]here is no medical reason why [Hooper] could not perform basic unskilled work tasks." AR at 20-22.

*Colvin*, No. 13-CV-6503 (MWP), 2015 WL 925965, at *10 (W.D.N.Y. March 4, 2015)

(remanding where "[t]he ALJ thoroughly reviewed and discussed the treatment

records, but did not have a medical source statement or a consultative examination

report to assist him in translating the treatment notes into an assessment of [the

claimant's] mental capacity for work related activities," and instead "used his own

lay opinion to determine" the claimant's mental RFC); *Aceto v. Comm'r of Social

Sec.*, No. 6:08-CV-169 (FJS), 2012 WL 5876640, at *16 (N.D.N.Y. Nov. 20, 2012)

("Since the ALJ had nothing more than treatment records and consultative reports

to review, he had an affirmative duty to develop the record and request that

Plaintiff's treating physicians assess her RFC.").

The Commissioner contends that Hooper's school records, medical records,

social work records, and her own statements "show that she functioned adequately

on a daily basis" and provided the ALJ with "complete information about [Hooper's]

adaptive functioning necessary to . . . address her mental residual functional

capacity." Stip. at 21-22. However, as in *Sanchez*, "the balance of the record . . .

does not cure this central flaw." 2015 WL at 736102, at *7. Although the record is

extensive, the absence of any up-to-date medical opinion assessing Hooper's mental

functional limitations remains an "obvious gap." *Swiantek*, 588 F. App'x at 84

(finding there was no "obvious gap" in the record where the ALJ "based his findings

on the psychiatric evaluation of a consultative psychologist who personally

examined [the claimant] as well as . . . [a] complete medical history and treatment

notes, which themselves contained multiple psychological assessments.") (quoting

*Rosa*, 168 F.3d at 83 n.5). The ALJ could have done more to obtain opinions from treating sources such as psychiatrist Dr. Casimir, nurse practitioner Heinz, and social workers Willis and Simone. Failing that, he could have secured a consultative examination. For these reasons, the ALJ's RFC determination was made on an incomplete record and the failure to seek a treating source opinion is grounds for remand.

### 3. The ALJ Should Reassess Whether He Should Consult a Vocational Expert on Remand

Hooper contends that, at step five of the analysis, the ALJ should have sought the testimony of a vocational expert instead of relying on the Grids to find that Hooper was capable of finding work in the national economy. Stip. at 22. Because the Court remands the case for the ALJ's failure to develop the record at step four, the Court does not need to reach this issue. Instead, on remand, the Court directs the ALJ to reassess whether exclusive reliance on the Grids was permissible.

"Limitations or restrictions which affect a claimant's ability to meet the demands of jobs other than the strength demands, that is, other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional." 20 C.F.R. § 404.1569a(c)(1)(i)(vi); *see also Zorilla v. Chater,* 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (where restrictions "limit the range of sedentary work that the claimant can perform the ALJ may be precluded from relying exclusively on the Grids"). When such nonexertional impairments are present, "the Commissioner must 'introduce the testimony of a vocational expert (or other similar

evidence) that jobs exist in the economy which claimant can obtain and perform."
*Id.* (quoting *Bapp,* 802 F.2d at 603). Nonetheless, the "mere existence of a
nonexertional impairment does not automatically . . . preclude reliance on the
guidelines." *Zabala v. Astrue,* 595 F.3d 402, 410–11 (2d Cir. 2010) (citation
omitted). Instead, the vocational expert must be called upon where the limitation
involved results in "an additional loss of work capacity . . . that so narrows a
claimant's possible range of work as to deprive him of a meaningful employment
opportunity." *Bapp,* 802 F.2d at 603.

At step four, the ALJ concluded that Hooper could "perform a full range of
work at all exertional levels but with the following nonexertional limitations: she is
limited to simple, routine, and repetitive tasks." AR at 19. At step five, the ALJ
found that "these limitations have little or no effect on the occupational base of
unskilled work at all exertional levels. A finding of 'not disabled' is therefore
appropriate." *Id.* at 24. The ALJ based his decision on an incomplete record lacking
an RFC report and treating physician's opinion. After further development of the
record and based on the proper review of opinion evidence, it is certainly possible
that the ALJ could determine that Hooper exhibited at least moderate functional
limitations, which may require him to consult a vocational expert. Consequently,
while the Court need not determine whether the ALJ erred by relying exclusively on
the Grids here, the Court directs the ALJ to make a renewed determination on this
question on remand. *See, e.g., Randolph*, No. 12-CV-8539, at *13 (directing the ALJ

to revisit the need for vocational testimony after proper review of the record on remand).

### III.   CONCLUSION

For the foregoing reasons, this case is remanded pursuant to sentence four of 42 U.S.C. § 405(g).  On remand, the ALJ should:

1.  Further develop the evidentiary record by soliciting medical opinions from at least one of Hooper's treating physicians in order to address her mental functional limitations;

2.  Specify, upon further development of the record, what weight he affords to Hooper's treating physician's opinion, if it is not deemed controlling;

3.  Provide a comprehensive analysis for why he affords this particular weight to the treating physician's opinion, if it is not deemed controlling, based on the appropriate factors outlined above; and

4.  Reconsider, based on his findings after proper development of the record, whether Hooper's nonexertional limitations, if any, are significant enough to require consultation with a vocational expert.

**SO ORDERED.**

Dated: New York, New York
     August 5, 2016

_____
JAMES L. COTT
United States Magistrate Judge